Daniel Sadeh, Esq.
**HALPER SADEH LLP**
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com

*Counsel for Plaintiff*

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAULA SCHOENHOFF, | Case No: |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| CARDTRONICS PLC, MARK ROSSI, DOUGLAS L. BRAUNSTEIN, JULIE GARDNER, WARREN C. JENSON, G. PATRICK PHILLIPS, JULI C. SPOTTISWOOD, and RAHUL GUPTA, | |
| Defendants. | |

### COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Paula Schoenhoff ("Plaintiff"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys.

### NATURE OF THE ACTION

1.      This is an action against Cardtronics plc ("Cardtronics" or the "Company") and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9, in

1

connection with the proposed acquisition (the "Proposed Transaction") of Cardtronics by NCR Corporation ("NCR").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and 78t(a)) and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as a substantial portion of the transactions and wrongs complained of herein had an effect in this District, the alleged misstatements entered and the subsequent damages occurred in this District, and the Company conducts business in this District, including operating ATMs in this District.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff is, and has been at all relevant times hereto, an owner of Cardtronics common stock.

7.      Defendant Cardtronics provides automated consumer financial services through its network of automated teller machines and multi-function financial services kiosks. The Company

is incorporated in England and Wales. The Company's common stock trades on the NASDAQ under the ticker symbol, "CATM."

8.    Defendant Mark Rossi ("Rossi") is Chair of the Board of the Company.

9.    Defendant Douglas L. Braunstein ("Braunstein") is a director of the Company.

10.    Defendant Julie Gardner ("Gardner") is a director of the Company.

11.    Defendant Warren C. Jenson ("Jenson") is a director of the Company.

12.    Defendant G. Patrick Phillips ("Phillips") is a director of the Company.

13.    Defendant Juli C. Spottiswood ("Spottiswood") is a director of the Company.

14.    Defendant Rahul Gupta ("Gupta") is a director of the Company.

15.    Defendants Rossi, Braunstein, Gardner, Jenson, Phillips, Spottiswood, and Gupta are collectively referred to herein as the "Individual Defendants."

16.    Defendants Cardtronics and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A.  The Proposed Transaction

17.    On January 25, 2021, Cardtronics and NCR announced that they had entered into a definitive agreement under which NCR would acquire all outstanding shares of Cardtronics for $39.00 per share in an all-cash transaction. The press release announcing the Proposed Transaction states, in pertinent part:

**NCR and Cardtronics Announce Definitive Acquisition Agreement at $39.00 Per Share**

*Accelerates NCR-as-a-Service Strategy and Expands Opportunities in Payments*

*Transaction Expected to be Accretive to NCR Earnings in First Full Year*

3

January 25, 2021 08:22 AM Eastern Standard Time

ATLANTA & HOUSTON--(BUSINESS WIRE)--NCR Corporation (NYSE: NCR), a global enterprise technology provider for the financial, retail and hospitality industries, and Cardtronics (Nasdaq: CATM), the world's largest non-bank ATM operator and service provider, today announced that they have entered into a definitive agreement under which NCR will acquire all outstanding shares of Cardtronics for $39.00 per share in an all-cash transaction with an enterprise value of approximately $2.5 billion, including debt. The transaction has been approved by the Boards of Directors of both companies.

"This transaction accelerates the NCR-as-a-Service strategy we laid out at Investor Day in December, further shifts NCR's revenue mix to software, services and recurring revenue, and adds value for our customers," said Michael D. Hayford, President and Chief Executive Officer of NCR. "We have had a long-standing relationship with Cardtronics and its outstanding team. Its Allpoint network is highly complementary to NCR's payments platform, and the combined company will be able to seamlessly connect retail and banking customers. Simply put, we are better together."

"We are pleased to announce this compelling transaction, which will deliver superior value to our shareholders," said Edward H. West, Chief Executive Officer of Cardtronics. "This is a testament to the strength and value of Cardtronics, our talented team and customer base, and the complementary nature of our two businesses. Our Board determined that this transaction, which follows a comprehensive process and review of alternatives, is in the best interest of Cardtronics and our shareholders."

The combined company is expected to achieve $100-$120 million in run rate operating cost synergies by the end of 2022. The transaction is expected to be accretive to NCR's non-GAAP EPS in the first full year following the close of the transaction.

NCR plans to finance the transaction with cash on hand and fully committed financing from Bank of America, N.A. The transaction is expected to close in mid-year 2021, subject to receipt of regulatory approvals and satisfaction of customary closing conditions, including approval by Cardtronics' shareholders. Upon completion of the transaction, Cardtronics will become a privately held company and Cardtronics' common shares will no longer be listed on any public market.

Prior to entry into the agreement with NCR, Cardtronics terminated its previously announced acquisition agreement with an entity affiliated with funds managed by affiliates of Apollo Global Management, Inc. in accordance with the terms of the acquisition agreement. In connection with the termination, NCR paid the termination fee of $32.6M in accordance with the terms of the acquisition agreement.

4

BofA Securities is serving as financial advisor to NCR and Skadden, Arps, Slate, Meagher & Flom LLP is serving as legal counsel. Goldman Sachs & Co. LLC is serving as financial advisor to Cardtronics, and Weil, Gotshal & Manges LLP and Ashurst LLP are serving as legal counsel.

* * *

**About NCR Corporation**

NCR Corporation (NYSE: NCR) is a leading software- and services-led enterprise provider in the financial, retail and hospitality industries. NCR is headquartered in Atlanta, Ga., with 36,000 employees globally. NCR is a trademark of NCR Corporation in the United States and other countries.

Web site: www.ncr.com
Twitter: @NCRCorporation
Facebook: www.facebook.com/ncrcorp
LinkedIn: www.linkedin.com/company/ncr-corporation
YouTube: www.youtube.com/user/ncrcorporation

**About Cardtronics**

Cardtronics is the trusted leader in financial self-service, enabling cash transactions at over 285,000 ATMs across 10 countries in North America, Europe, Asia-Pacific, and Africa. With our scale, expertise and innovation, top-tier merchants and businesses of all sizes use our ATM solutions to drive growth, in-store traffic, and retail transactions. Financial services providers rely on Cardtronics to deliver superior service at their own ATMs, on Cardtronics ATMs where they place their brand, and through Cardtronics' Allpoint Network, the world's largest retail based surcharge-free ATM network, with over 55,000 locations. As champions of cash, Cardtronics converts digital currency into physical cash, driving payments choice for businesses and consumers alike. Learn more about Cardtronics by visiting www.cardtronics.com and by following us on LinkedIn and Twitter.

18.     On March 30, 2021, the Company filed a Schedule 14A Definitive Proxy Statement under Section 14(a) of the Exchange Act (the "Proxy Statement") with the SEC in connection with the Proposed Transaction.

**B.  The Proxy Statement Contains Materially False and Misleading Statements and Omissions**

19.     The Proxy Statement, which recommends that Cardtronics shareholders vote in favor of the Proposed Transaction, omits and/or misrepresents material information concerning:

(i) Cardtronics' financial projections; (ii) the financial analyses performed by Cardtronics' financial advisor, Goldman Sachs & Co. LLC ("Goldman Sachs"), in connection with its fairness opinion; (iii) potential conflicts of interest involving Goldman Sachs; and (iv) the sales process leading up to the Proposed Transaction.

20.     The omission of the material information (referenced below) renders the following sections of the Proxy Statement false and misleading, among others: (i) Background of the Acquisition; (ii) Recommendation of the Board; (iii) Reasons for Recommending the Approval of the Acquisition; (iii) Opinion of Goldman Sachs & Co. LLC; and (iv) Certain Financial Projections Utilized in Connection with the Acquisition.

21.     Unless and until the material misstatements and omissions (referenced below) are remedied before the May 7, 2021 shareholder vote on the Proposed Transaction, Cardtronics shareholders will be forced to make a voting decision on the Proposed Transaction without full disclosure of all material information. In the event the Proposed Transaction is consummated, Plaintiff may seek to recover damages resulting from Defendants' misconduct.

### 1. Material Omissions Concerning Cardtronics' Financial Projections

22.     The Proxy Statement omits material information concerning Cardtronics' financial projections.

23.     With respect to the "December 2020 Projections," the Proxy Statement fails to disclose: (1) all line items underlying (i) Revenue, (ii) Adjusted EBITDA, (iii) Adjusted EPS, (iv) CapEx, (v) Adjusted EBITDA – CapEx, and (vi) Unlevered Free Cash Flows; (2) the Company's

net income projections;[1] and (3) a reconciliation of all non-GAAP to GAAP metrics.

24.     The disclosure of this information is material because it would provide the Company's shareholders with a basis to project the future financial performance of the Company and would allow shareholders to better understand the financial analyses performed by the Company's financial advisor in support of its fairness opinion. Shareholders cannot hope to replicate management's inside view of the future prospects of the Company. Without such information, which is uniquely possessed by Defendant(s) and the Company's financial advisor, the Company's shareholders are unable to determine how much weight, if any, to place on the Company's financial advisor's fairness opinion in determining whether to vote for or against the Proposed Transaction.

25.     When a company discloses non-GAAP financial metrics in a Proxy Statement that were relied upon by its board of directors in recommending that shareholders exercise their corporate suffrage rights in a particular manner, the company must also disclose, pursuant to SEC Regulation G, all projections and information necessary to make the non-GAAP metrics not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial metrics disclosed or released with the most comparable financial metrics calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.[2]

---

[1] According to the Proxy Statement, "Adjusted EPS is calculated by dividing Adjusted Net Income by weighted average diluted shares outstanding. Adjusted Net Income represents ***net income*** . . ." *See* Proxy Statement at 55 (emphasis added). Therefore, Cardtronics' net income projections exist and must be disclosed.

[2] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-*

26.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

### 2. Material Omissions Concerning Goldman Sachs' Analyses

27.     In connection with the Proposed Transaction, the Proxy Statement omits material information concerning analyses performed by Goldman Sachs.

28.     The Proxy Statement fails to disclose the following concerning Goldman Sachs' "*Illustrative Discounted Cash Flow Analysis*": (1) the individual inputs and assumptions underlying the (i) discount rates ranging from 7.5% to 8.5%, (ii) range of terminal year multiples of 6.0x to 7.5x, and (iii) perpetuity growth rates ranging from (0.1)% to 2.3%); (2) all line items underlying the unlevered free cash flow to be generated by the Company for the period from January 1, 2021 to December 31, 2025; (3) the range of illustrative terminal values for the Company as of December 31, 2025; (4) the Company's Net Debt as of December 31, 2020; and (5) the implied total number of fully diluted shares of the Company as of January 21, 2021.

29.     The Proxy Statement fails to disclose the following concerning Goldman Sachs' "*Illustrative Present Value of Future Share Price Analysis*": (1) the individual inputs and assumptions underlying the (i) multiples ranging from 12.0x to 16.0x, and (ii) discount rate of 9.6%; and (2) the theoretical future values per share of the Company as of December 31 of each of 2021, 2022 and 2023.

30.     With respect to Goldman Sachs' "*Premia Paid Analysis*," the Proxy Statement fails

---

*GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html (footnotes omitted) (last visited Apr. 26, 2021) ("And last month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.").

to disclose each transaction and the individual premiums paid therein.

31.     The valuation methods, underlying assumptions, and key inputs used by Goldman Sachs in rendering its purported fairness opinion must be fairly disclosed to Cardtronics shareholders. The description of Goldman Sachs' fairness opinion and analyses, however, fails to include key inputs and assumptions underlying those analyses. Without the information described above, Cardtronics shareholders are unable to fully understand Goldman Sachs' fairness opinion and analyses, and are thus unable to determine how much weight, if any, to place on them in determining whether to vote for or against the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

### 3.     Material Omissions Concerning Potential Conflicts of Interest Involving Goldman Sachs

32.     The Proxy Statement omits material information concerning potential conflicts of interest involving Goldman Sachs.

33.     The Proxy Statement provides that Goldman Sachs may receive a "potential discretionary fee of $2.5 million" for its services to Cardtronics in connection with the Proposed Transaction, but fails to disclose the circumstances under which Goldman Sachs may receive a "potential discretionary fee of $2.5 million" and whether the Company intends to pay Goldman Sachs such a fee.

34.     Further, the Proxy Statement provides that "the Company engaged Goldman Sachs to act *as one of its financial advisors in connection with the Acquisition*."

35.     The Proxy Statement, however, fails to disclose the following concerning Cardtronics additional financial advisor(s): (1) the identities of the additional financial advisor(s) retained by Cardtronics; (2) the amount of compensation these advisor(s) have received or will

receive in connection with their engagement by the Company; (3) the amount of the advisor(s)'s compensation that is contingent upon consummation of the Proposed Transaction; and (4) whether the advisor(s) have performed past services for any parties to the Proposed Transaction and/or their affiliates, including the timing and nature of those services and the amount of compensation received for providing such services.

36.     The Proxy Statement also fails to disclose the financial analyses performed by the Company's additional financial advisor(s), as applicable.

37.     Disclosure of a financial advisor's compensation and potential conflicts of interest to shareholders is required due to their central role in the evaluation, exploration, selection, and implementation of strategic alternatives and the rendering of any fairness opinions. Disclosure of a financial advisor's potential conflicts of interest may inform shareholders on how much weight to place on that analysis.

38.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

**4.   Material Omissions Concerning the Sales Process Leading up to the Proposed Transaction**

39.     The Proxy Statement omits material information concerning the sales process leading up to the Proposed Transaction.

40.     The Proxy Statement provides that Cardtronics entered into non-disclosure agreements with multiple potential buyers during the sales process leading up to the Proposed Transaction.

41.     The Proxy Statement, however, fails to disclose the terms of Cardtronics' non-disclosure agreements, including whether such agreements contained standstill provisions with "don't ask, don't waive" (DADW) provisions (including their time of enforcement) that would

preclude interested parties from making superior offers for the Company.

42.     Without this information, Cardtronics shareholders may have the mistaken belief that potential suitors are or were permitted to submit superior proposals for the Company, when in fact they are or were contractually prohibited from doing so. This information is material because a reasonable Cardtronics shareholder would want to know, prior to voting for or against the Proposed Transaction, whether other potential buyers are or were foreclosed from submitting a superior proposal.

43.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

## COUNT I
### For Violations of Section 14(a) and Rule 14a-9 Promulgated Thereunder
### Against All Defendants

44.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

45.     During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

46.     Each of the Individual Defendants, by virtue of his/her positions within the Company as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a) of the Exchange Act. Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use of their names to file and disseminate the Proxy Statement with respect to the Proposed Transaction. The Defendants were, at minimum, negligent in filing the materially false and

misleading Proxy Statement.

47.     The false and misleading statements and omissions in the Proxy Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.

48.     By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

49.     Because of the false and misleading statements and omissions in the Proxy Statement, Plaintiff is threatened with irreparable harm.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

50.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

51.     The Individual Defendants acted as control persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their senior positions as officers and/or directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading Proxy Statement.

52.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. As officers and/or directors of a publicly owned

company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Proxy Statement, and to correct promptly any public statements issued by the Company which were or had become materially false or misleading.

53.     In particular, each of the Individual Defendants had direct and supervisory involvement in the operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. The Proxy Statement at issue contains the recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, the Individual Defendants were directly involved in the making of the Proxy Statement.

54.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the Individual Defendants.

55.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

56.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, the Company's shareholders will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to Company shareholders;

B.      In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.      Declaring that Defendants violated Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder;

D.      Awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: April 26, 2021                                        Respectfully submitted,

**HALPER SADEH LLP**

By: /s/ Daniel Sadeh
Daniel Sadeh, Esq.
Zachary Halper, Esq. (to be admitted *pro hac vice*)
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com
        zhalper@halpersadeh.com

*Counsel for Plaintiff*